IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **MARGARITA SANTIAGO ORTIZ**, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>**CAPARRA CENTER ASSOCIATES, LLC**, *et al.*,<br><br>    Defendants. | Civil No. 14-1914 (BJM) |

**OPINION AND ORDER**

Margarita Santiago Ortiz ("Santiago") and Jan M. Derieux Lebrón ("Derieux"), personally and on behalf of their minor daughter, J.D.S. (collectively, "plaintiffs"), sued Caparra Center Associates, LLC ("Caparra") and Capitol Security Police, Inc. ("Capitol") (collectively, "defendants"),[1] alleging a violation of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12181–12189, and Article 1802 of the Puerto Rico Civil Code ("Article 1802"), P.R. Laws Ann. tit. 31, § 5141. Docket No. 1. Plaintiffs seek money damages, injunctive relief, and attorneys' fees. Defendants moved to dismiss the complaint for lack of subject matter jurisdiction, as well as for failure to state a claim, Docket Nos. 27, 33, and plaintiffs opposed, Docket No. 30. The case is before me on consent of the parties. Docket No. 20.

For the following reasons, the motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.

**MOTION TO DISMISS STANDARD**

Rule 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The "party invoking the jurisdiction of a federal court carries the burden of proving its existence." *P.R. Tel. Co. v. Telecomm's Reg. Bd. of P.R.*, 189 F.3d 1,

---

[1] Also included in the complaint are fictitious defendants John Doe, ABC Insurance Co., and Richard Roe Insurance Co. Compl. ¶¶ 7, 8, 10.

7 (1st Cir. 1999). When deciding whether subject matter jurisdiction exists, the court follows two general rubrics: (1) when a defendant challenges the legal sufficiency of the facts alleged, the court credits plaintiffs' factual allegations and draws reasonable inferences in his or her favor; and (2) when the defendant challenges the truth of the plaintiffs' facts and offers contrary evidence, the court weighs the evidence. *Valentín v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001).

To survive a Rule 12(b)(6) motion, on the other hand, "an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Ocasio-Hernández v. Fortuño-Burset,* 640 F.3d 1, 12 (1st Cir. 2011). The plaintiff must set forth "factual allegations, either direct or inferential, regarding each material element necessary" for the action. *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514 (1st Cir. 1988). In evaluating a motion to dismiss, the court first discards any "'legal conclusions couched as fact' or 'threadbare recitals of the elements of a cause of action.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)). The remaining "[n]on-conclusory factual allegations" are fully credited, "even if seemingly incredible." *Id*.

In resolving a Rule 12(b)(6) motion, the court engages in no fact-finding and does not "forecast a plaintiff's likelihood of success on the merits." *Ocasio-Hernández*, 640 F.3d 13. Rather, it presumes that the facts are as properly alleged by the plaintiff, and draws all reasonable inferences in the plaintiff's favor. *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Taken together, the facts pleaded must "state a plausible, not a merely conceivable, case for relief." *Ocasio-Hernández*, 640 F.3d at 12.

## BACKGROUND[2]

Eight-year-old J.D.S. suffers from epilepsy, and must always be accompanied by her service dog, a two-year-old Shitzu that is trained to serve J.D.S.'s medical needs,

---

[2] These facts are drawn from the well-pleaded allegations in the complaint, and are assumed true for the purposes of this motion. Docket No. 1.

warn her of an epilepsy attack before it occurs, assist her during an attack, and summon help. Compl. ¶¶ 11–12. The service dog accompanies J.D.S. everywhere she goes, including school; has done so for the past years; is registered as a service dog with the U.S. Service Dog Registry; and always wears a service-dog identification and vest. *Id.* ¶¶ 12–13.

J.D.S. and her parents are residents of Bayamon, Puerto Rico, and visited the nearby San Patricio Shopping Center ("Center") in Guaynabo, Puerto Rico, on February 10, 2014. *Id.* ¶ 21. Caparra owns and operates the Center, and Capitol provides security services for the Center. *Id.* ¶¶ 6, 9. During this visit, plaintiffs were "detained," though it is unclear for how long, by a Capitol security guard because they were accompanied by J.D.S.'s service dog. *Id.* ¶¶ 20–21. Following this incident, plaintiffs drafted a letter to Caparra and Capitol, which they delivered to the security guards' office at the Center, advising them that the security guards were "violating the law by discriminating against people with an impairment." *Id.* Neither Caparra nor Capitol responded to the letter. *Id.*

J.D.S., again accompanied by her parents and service dog, returned to the Center on March 11, 2014. *Id.* ¶ 14. While walking through one of the Center's hallways, plaintiffs were "intercepted" by a Capitol security guard, who was identified only as "Hernandez." *Id.* ¶ 15. Hernandez told them that animals were not permitted in the Center, and requested that they carry J.D.S.'s service dog and leave. *Id.* Explaining that the service dog was identified as J.D.S.'s service animal, her parents refused to do so and told Hernandez to call his supervisor. *Id.* ¶ 16. Notwithstanding the explanation, Hernandez reiterated the request, this time "in a harsh manner." *Id.* Plaintiffs ignored that request, and entered one of the Center's department stores. *Id.* ¶ 17.

Later, near a different store, they again encountered Hernandez, who "stared intensively at plaintiffs." *Id.* Because of his intensive staring, Derieux approached Hernandez and asked him whether he had been given guidance on how to deal with service dogs. *Id.* ¶ 18. In a "rather hostile tone" and "threatening manner," Hernandez

screamed at plaintiffs, "you don't know who I am." *Id.* Hernandez repeated this phrase and attempted to physically assault them, prompting another security guard, identified only as "Lopez," to restrain him. *Id.*

Plaintiffs told the security guards that they were going to call the police, and could sue them for their actions, to which Hernandez responded, "like the other time that you said that you were going to sue and did not do anything." *Id.* ¶¶ 19–20. The Puerto Rico Police arrived, took a report, and admonished Capitol's security guards that they could not interfere with plaintiffs. *Id.* ¶¶ 18–19. After this incident, plaintiffs suffered various symptoms of emotional distress, including depression, fear, and anxiety, and "became nervous for not being able to enjoy the premises of the [Center]." *Id.* ¶ 31. In light of these symptoms, and to avoid incidents like the one at the Center, J.D.S. has become house-ridden. *Id.* ¶ 32. As a result of these incidents, plaintiffs seek monetary damages and injunctive relief. *Id.* ¶¶ 30–36.

## DISCUSSION

Defendants contend that plaintiffs are not entitled to money damages, and that injunctive relief is unwarranted because the complaint fails to state an ADA violation and because there is an insufficient likelihood that the alleged injury will recur. Plaintiffs respond that they have standing to request injunctive relief, and that they are entitled to money damages.

**I.     The ADA**

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Title III of the ADA targets discrimination in privately operated places of public accommodation, stating that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of

public accommodation." 42 U.S.C. § 12182(a); *Dudley v. Hannaford Bros. Co.*, 333 F.3d 299, 303 (1st Cir. 2003) (*Dudley*).

The statute defines "discrimination" to include "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

This statutory framework thus requires a plaintiff to make a six-part showing: (1) that she "comes within the protections of the ADA as a person with a disability"; (2) that "the defendant's establishment is subject to the mandates of Title III as a place of public accommodation"; (3) that "the defendant has a discriminatory policy or practice in effect"; (4) that she "requested a reasonable modification in that policy or practice which, if granted, would have afforded him access to the desired goods"; (5) "that the requested modification—or a modification like it—was necessary to afford that access"; and (6) "that the defendant nonetheless refused to modify the policy or practice." *Dudley*, 333 F.3d at 307 (citations omitted).

### A.     Persons Protected Under the ADA

Defendants first argue that the complaint fails to state sufficient facts alleging that each plaintiff (J.D.S., Santiago, and Derieux) comes within the ADA's protections. A "disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities"[3] of an individual. 42 U.S.C. § 12102(1)(A). Congress has instructed that this definition should be construed "in favor of broad coverage of

---

[3] "Major life activities are basic activities of daily life that an average person in the general population can perform with little or no difficulty—'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'" *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011) (*Ramos-Echevarria*) (quoting 29 C.F.R. § 1630.2(i)).

individuals . . . to the maximum extent permitted . . . ." *Id.* § 12102(4)(A); *see also Arnold v. United Parcel Serv., Inc.*, 136 F.3d 854, 861 (1st Cir. 1998) ("It is a 'familiar canon of statutory construction that remedial legislation,' such as the ADA, 'should be construed broadly to effectuate its purposes.') (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).

Beginning with J.D.S., defendants acknowledge that the complaint alleges she suffers from epilepsy. Yet, they contend that the complaint fails to allege additional facts to reasonably infer that her impairment substantially limits a major life activity. Not so. As an initial matter, a "person with epilepsy can certainly be disabled under the ADA." *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 352 (4th Cir. 2001) (citing *Otting v. J.C. Penney Co.*, 223 F.3d 704, 709–10 (8th Cir. 2000)). After all, Congress contemplated such a condition when it enacted the ADA. *See Sara Lee Corp.*, 237 F.3d at 352 (citing H.R. Rep. No. 485(II), 101st Cong., 2d Sess. 52, reprinted in 1990 U.S.C.C.A.N. 303, 334 ("epilepsy" can be an impairment that substantially limits a major life activity)).

At the outset, the complaint alleges that the ADA action is premised on discrimination against an individual with a physical or mental impairment that substantially limits one or more of the major life activities. Compl. ¶ 11. It then alleges various facts that permit the inference defendants contend is lacking. Specifically, the complaint alleges that J.D.S. has had the service dog for the past years, and that it accompanies her everywhere she goes, including school, because it warns her of an epilepsy attack before it occurs, provides assistance during an attack, and summons help. *Id.* ¶¶ 12–14. These allegations state a plausible allegation that J.D.S. is disabled within the meaning of the ADA because it is reasonable to infer that she is unable to care for herself—a major life activity—when she is suffering from an epilepsy attack. *See* 29 C.F.R. § 1630.2(i) (caring for one's self is a major life activity). Additionally, that she has had the service dog for the "past years," and that the service dog must accompany her

Santiago Ortiz, et al. v. Caparra Center Associates, et al., Civil No. 14-1914 (BJM)                                   7

everywhere she goes, permits the inference that her condition is not a transitory one, nor limited to specific locations.

What is more, some courts have held that a plaintiff "is not required, at th[e] early pleading stage, to go into particulars about the life activity affected by her alleged disability or detail the nature of her substantial limitations." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 213 (3d Cir. 2009) (holding that is the rule even after the *Twombly* and *Iqbal* plausibility standard); *accord EEOC v. J.H. Routh Packing Co.*, 246 F.3d 850, 854 (6th Cir. 2001) ("[S]o long as the complaint notifies the defendant of the claimed impairment, the substantially limited major life activity need not be specifically identified in the pleading."). These cases were decided before the amendments to the ADA, and nonetheless evince the "low standard for surviving motions to dismiss." *Garcia-Hicks v. Vocational Rehab. Admin.*, No. CV 13-1491(FAB), 2015 WL 7720343, at *6 (D.P.R. Nov. 30, 2015).

The ADA amendments fortified the rationale underlying these cases, as the amendments were intended to shift "the primary object of attention" from "whether an individual's impairment is a disability under the ADA" to "whether entities covered under the ADA have complied with their obligations." Pub. L. No. 110–325, § (2)(b)(5), 122 Stat. 3553. Accordingly, after the amendments, courts are generally more reluctant to dismiss disability discrimination claims at the motion-to-dismiss stage. *See Garcia-Hicks*, 2015 WL 7720343, at *8 (collecting cases); *see also Coffman v. Taqueria Los Gallos*, No. 3:15-CV-00191-RCJ, 2015 WL 3935180, at *4 (D. Nev. June 26, 2015) (complaint sufficiently stated a Title III claim where it alleged that plaintiff "was denied goods and services in the Defendant restaurant because of his disability, i.e., because he needed his seeing-eye dog to aid him due to his disability, and Defendant failed to reasonably modify its policy against dogs as necessary for Plaintiff to be afforded Defendant's goods and services."). Thus, the complaint sufficiently alleges that J.D.S. is disabled within the meaning of the ADA.

To be sure, defendants cite ADA cases like *Ramos-Echevarria* for support. 659 F.3d 182. In that case, for example, the court held that "[e]vidence of a medical diagnosis of impairment, standing alone, is insufficient to *prove* a disability." *Id.* at 187 (emphasis added). However, *Ramos-Echevarria* involved an ADA claim that was adjudicated at the summary judgment stage, not the pleadings stage. *See id.* at 191. At this early stage in the proceedings, J.D.S. is not required to establish the elements of her claim with evidence. Rather, she is only required to allege sufficient facts from which it can be inferred that she is disabled. *See, e.g.*, *Ocasio-Hernández*, 640 F.3d at 12. She has done so.

Turning to J.D.S.'s parents, Santiago and Derieux, defendants press that the complaint is silent on "the existence of any kind of physical or mental impairment" that they have. True enough. Yet, defendants' contention that they therefore lack standing to sue under the ADA does not necessarily follow because "it is widely accepted that under both the [Rehabilitation Act] and the ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person." *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1142 (11th Cir. 2014) (collecting five circuit court cases); *see also Weber v. Cranston Sch. Comm.*, 212 F.3d 41, 47–49 (1st Cir. 2000) (parent had standing to sue under the Rehabilitation Act). Indeed, the ADA provides that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C.A. § 12182(1)(E). The complaint alleges that J.D.S.'s parents were asked to leave the Center on March 11 when accompanying J.D.S. and her service dog, even after they told the security guard that the dog was a disabled person's service animal. The complaint thus alleges sufficient facts to state an ADA claim for Santiago and Derieux.

Santiago Ortiz, et al. v. Caparra Center Associates, et al., Civil No. 14-1914 (BJM)                                                9

### B.     Discriminatory Practice or Policy

Defendants next contend that the complaint fails to plead sufficient facts alleging that plaintiffs were denied access to the Center or a reasonable accommodation, arguing that the "ADA regulations do not create a blanket right of universal and automatic access to public accommodations for all service animals." Defs.' Mot. Dismiss J. 14.

Following Congress's directive, 42 U.S.C. § 12186(b), the Department of Justice promulgated a regulation, which provides that "[g]enerally, a public accommodation shall modify policies, practices, or procedures to permit the use of a service animal by an individual with a disability." 28 C.F.R. § 36.302(c)(1). Consistent with this regulation, "modifying a no animals policy to allow a service animal full access with its owner in a place of public accommodation is generally reasonable." *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1060 (5th Cir. 1997). It is true that a public accommodation may ask a disabled individual to remove a service animal when (1) "the animal is out of control and the animal's handler does not take effective action to control it" or (2) "the animal is not housebroken." 28 C.F.R. § 36.302(c)(2)(i)–(ii). But even when it may do so, the public accommodation must still "give the individual with a disability the opportunity to obtain goods, services, and accommodations without having the service animal on the premises." *Id.* § 36.302(c)(3).

In addition, a public accommodation may not "ask about the nature or extent of a person's disability." 28 C.F.R. § 36.302(c)(6). Indeed, the First Circuit has explained that that "the obviousness vel non of an individual's disability has no relevance to the mandates of Title III." *Dudley*, 333 F.3d at 309. It is generally permissible, however, for the public accommodation to "make two inquiries" to determine whether the animal qualifies as a service animal: whether (1) "the animal is required because of a disability," and (2) "what work or task the animal has been trained to perform." 28 C.F.R. § 36.302(c)(6).

Case 3:14-cv-01914-BJM   Document 45   Filed 03/21/16   Page 10 of 15

Santiago Ortiz, et al. v. Caparra Center Associates, et al., Civil No. 14-1914 (BJM)                           10

With this framework underfoot, the defendants' suggestion that the complaint limns a nondiscriminatory scenario is unavailing. The complaint does not allege, for example, that the security guards asked either of the two permissible inquiries under the ADA regulations, and that the plaintiffs were asked to leave only after refusing to answer the inquiries. *See* 28 C.F.R. § 36.302(c)(6). Neither does the complaint disclose any facts which suggest that plaintiffs were asked to remove the dog because it was unruly or not housebroken. *See* 28 C.F.R. § 36.302(c)(2)(i)–(ii).

Instead, the complaint states a plausible ADA claim. It does so by first alleging that J.D.S. is disabled and that the Center is a public accommodation owned or operated by the defendants, the latter of which is not disputed by defendants. Having alleged these first two abecedarian elements of a Title III claim, the complaint goes on to allege the remaining four elements. It alleges (1) that the Center's security guards told plaintiffs that the Center does not allow animals, suggesting a hard-and-fast discriminatory policy or practice; (2) that plaintiffs twice informed defendants of their need for a reasonable accommodation, once via the February 10 letter and again on March 11; (3) that it was necessary for J.D.S.'s service animal to accompany them to access the Center; and (4) that the security guard on March 11 refused to allow plaintiffs to remain in the Center even after they explained that the dog was a service animal. Nothing more is required to state a plausible Title III claim and survive the motion to dismiss.

### C. Threat of Future Harm

Suggesting the harm plaintiffs allege will not recur, defendants contend plaintiffs lack standing to request injunctive relief. To determine whether a plaintiff has a private right of action under Title III, the court must determine whether plaintiffs have shown "a real and immediate threat that a particular (illegal) barrier will cause future harm." *Dudley*, 333 F.3d at 305–06. "This standard has been adapted from generic Supreme Court precedents discussing whether a plaintiff has standing to protest a particular injury." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("the

irreducible constitutional minimum of standing" includes suffering an "injury in fact" that is "actual or imminent") (citations omitted); *City of L.A. v. Lyons*, 461 U.S. 95, 105, 103 (1983) (plaintiff requesting injunctive relief must "establish a real and immediate threat" that illegal conduct will occur); *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974) ("Abstract injury is not enough. . . . The injury or threat of injury must be both real and immediate, not conjectural or hypothetical.") (citations omitted)).

*Dudley* presents an apt example of the standing requirement in a Title III case where the plaintiff alleges discrimination because of a non-physical barrier to the public accommodation. 333 F.3d at 305–06. In that case, Dudley suffered from a disability which caused him to exhibit symptoms that mimicked the side effects of intoxication. *Id.* at 306. He attempted to purchase alcohol at the Gardiner Shop 'n Save, but was unable to do so because the store clerk thought he was inebriated and refused to make the sale. *Id.* Despite Dudley's attempts to explain his disability to a store manager, he ultimately left the store empty-handed because the store had a hard-and-fast policy precluding the store manager from overriding the store clerk's refusal to make the sale. *Id.* The First Circuit held these circumstances presented "a real and immediate threat of ongoing harm," reasoning that the store's offending policy remained in place, Dudley was likely to patronize the store, three of the store's employees had mistaken Dudley's disability for intoxication, and Dudley had previously experienced similar discrimination at other locations. *Id.*

As in *Dudley*, the allegations in the plaintiffs' complaint limn "a real and immediate threat of ongoing harm." *Id.* It alleges that the Center's security guards told J.D.S. and her parents that animals are prohibited in the Center. It can be reasonably inferred that this rule is a hard-and-fast one that does not permit exceptions because Capitol's security guard, Hernandez, reiterated his request that plaintiffs leave the Center even after J.D.S.'s parents explained that the dog was a service animal. What is more, the complaint suggests the March 11 incident was not a remote, isolated occurrence because

plaintiffs allege that they visited the Center on February 10 and were similarly detained by a Capitol security guard for having a service dog with them. Because the incidents on March 11 occurred despite plaintiffs' February 10 letter advising Caparra and Capitol of the alleged discriminatory conduct, the complaint permits the inference that defendants may have brushed aside the plaintiffs' experience at the Center and that the alleged discriminatory behavior will recur. And to the extent defendants suggest plaintiffs were required to allege more instances of discriminatory conduct, that contention is belied by another provision of the ADA, which "negates any requirement that a disabled person engage in a futile gesture to establish the existence of a discriminatory policy or practice." *Dudley*, 333 F.3d at 306 (citing 42 U.S.C. § 12188(a)(1)).

The complaint also permits the inference that more than one security guard has enforced the alleged policy or practice. It states that "a security guard" detained plaintiffs on February 10, but does not state that this security guard was either Hernandez or Lopez, both of whom were identified as being involved in the March 11 incident. And contrary to defendants' suggestion, the complaint does suggest that plaintiffs would like to return to the Center; yet, they imply that the actions by the Center's security guards have deterred them from returning. And Puerto Rico is an island after all, with only so many shopping centers available to the public. Injunctive relief, plaintiffs suggest, would prevent the alleged discriminatory incidents from recurring at this particular shopping center. In sum, plaintiffs have alleged sufficient facts to nudge their ADA claims beyond the plausibility threshold, and to allege that they have standing to request injunctive relief.

## II.     Claims for Damages

Defendants contend plaintiffs are not entitled to damages under Title III of the ADA, and that they improperly attempt to shoehorn the same facts alleged in their ADA claim into the Article 1802 claims. In response, plaintiffs do not argue that the complaint alleges tortious conduct distinct from that which forms their ADA claim. *See* Pls.' Opp'n

12–14. Instead, they make only two arguments: (1) that damages are available under Title III, "just as with Title II";[4] and (2) that "an action for damages under a state tort statute . . . is not incompatible with an action for injunctive relief under Title III of the ADA." *Id.*

Plaintiffs' first argument lacks merit, as "money damages are not an option for private parties suing under Title III of the ADA." *Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 50 (1st Cir. 2006); *see also Dudley*, 333 F.3d at 304 (the "compendium of remedies" afforded by section 12188(a)(1) includes injunctive relief, but not money damages). And the case plaintiffs rely on for support, *Parker v. Universidad de P.R.*, 225 F.3d 1 (1st Cir. 2000), is not to the contrary. In that case, the First Circuit remanded a Title II case to the district court, noted that "[n]either the Supreme Court nor this circuit ha[d] decided whether compensatory damages (other than backpay) are available under § 504 of the Rehabilitation Act or *Title II*," and "express[ed] no opinion on the merits." *Id.* at 8 (emphasis added). But *Parker* is inapposite authority in this case because plaintiffs' claims are governed by Title III—not Title II—of the ADA.

Turning to plaintiffs' second argument, it is true that a victim of disability discrimination may recover damages under a state-law provision even though Title III of the ADA permits only injunctive relief. *See, e.g.*, *Dudley*, 333 F.3d at 312 ("Unlike Title III of the ADA, the enforcement provisions of the [Maine Human Rights Act] allow the court . . . to assess monetary penalties (up to $10,000 against a first-time offender)"). Plaintiffs attempt to ground their claim for money damages under Article 1802, which provides that a person who "causes damages to another through fault or negligence" shall be liable. P.R. Laws Ann. tit. 31, § 5141. This claim requires "(1) the presence of a physical or emotional damage; (2) that the damage arose as a consequence of a negligent or intentional act or omission of the defendant; and (3) that there is a causal nexus

---

[4] I note that plaintiffs make this argument despite stating in another portion of their opposition that "[t]he only remedy available to a private litigant such as [J.D.S.] is that of injunctive relief and attorneys' fees." Pls.' Opp'n 11.

between the damage suffered and said act or omission." *Torres v. KMart Corp.*, 233 F. Supp.2d. 273, 275–76 (D.P.R. 2002).

However, an "Article 1802 claim is not cognizable" where it "arises from the same facts as plaintiff's claims under the ADA." *Aguirre v. Mayaguez Resort & Casino, Inc.*, 59 F. Supp. 3d 340, 357 (D.P.R. 2014). This is so because "the tort provision of the Civil Code is supplementary to special legislation." *Id.* Indeed, as the Puerto Rico Supreme Court recently explained, "Article 1802 constitutes a general source of law" that can serve as a vehicle for "emotional distress damages . . . as long as there is no applicable special law—such as a labor law—that may prohibit or limit such a claim." *Pagan-Renta v. Walgreens of San Patricio, Inc.*, 190 D.P.R. 251 (P.R. 2014). For example, *Pagan-Renta* held that neither an employee nor his spouse could recover emotional distress damages under Article 1802 where "a federal statute" (the Family Medical Leave Act, which has no "local equivalent" in Puerto Rico) barred the employee from recovering such damages and did "not recognize" that his spouse was entitled to such damages. *Id.* at 262, 264.

The complaint in this case re-alleges for the Article 1802 claim the same facts which formed the basis of plaintiffs' ADA claim, *see Aguirre*, 59 F. Supp. 3d at 357, and claims that defendants are liable "for the damages caused as a result of their discriminatory conduct towards" plaintiffs. Compl. ¶ 29. But as in *Pagan-Renta*, plaintiffs may not claim emotional distress damages under Article 1802 because the federal statute which governs their claim—Title III—limits their remedy to injunctive relief. 190 D.P.R. at 262, 264. Thus, plaintiffs' Article 1802 claims are dismissed.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is **GRANTED IN PART AND DENIED IN PART**. The following claims are **DISMISSED**: damages claims premised on a violation of Title III of the ADA, and plaintiffs' Puerto Rico Civil Code Article 1802 claims.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 21st day of March 2016.

                                       *S/ Bruce J. McGiverin*
                                       BRUCE J. MCGIVERIN
                                       United States Magistrate Judge